# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AQUA LOGIC, INC., a California Corporation,<br><br>                            Plaintiff,<br>   vs.<br>AQUATIC LOGIC, INC., an Illinois Corporation; DOMENIC VITRO; and DOES 1 through 10, inclusive,<br><br>                          Defendants. | **CASE NO. 09-CV-1791 H (BLM)**<br><br>**MEMORANDUM DECISION GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

      Plaintiff Aqua Logic, Inc. ("Plaintiff") filed its complaint against Defendants Aquatic Logic, Inc. and Domenic Vitro ("Defendants") on August 17, 2009. (Doc. No. 1.) Plaintiff filed a motion for preliminary injunction on August 31, 2009. (Doc. No. 4.) Defendants filed their opposition on September 29, 2009, (Doc. No. 18.), and Plaintiff submitted its reply on October 6, 2009. (Doc. No. 25.) The Court held a hearing on October 13, 2009 at 10:30 a.m. in courtroom 13. Cindy A. Brand and Ross G. Simmons appeared on behalf of Plaintiff and Benjamin Davidson appeared on behalf of Defendants. For the following reasons, the Court grants Plaintiff's motion for preliminary injunction.

///

///

## BACKGROUND

Plaintiff is a corporation of the State of California. (Doc. No. 1 ¶ 5.) Plaintiff alleges that it is a large aquarium, aquarium products, pond and pond products provider in the Untied States. (Id. ¶ 11.) Plaintiff is the owner of United States Trademark Registration No. 2,353,216 for "fish tanks, namely aquariums" and "fish tank cooling, heating, and recirculation systems comprised of water chillers, heat pumps, and electronic temperature controllers." (Id. ¶ 13.) Plaintiff has used the "Aqua Logic" mark and trade name for almost twenty years by prominently displaying it on products, containers, advertisements, displays, and other associated materials. (Id. ¶ 19.) In addition to marketing its products through trade magazines, Plaintiff advertises its products on its website: "www.aqualogicinc.com." (Id. ¶ 11; Doc. No. 30 ¶ 4.)

Defendant Aquatic Logic is a corporation of the State of Illinois. (Id. ¶ 6.) Defendant Domenic Vitro is the founder and president of Aquatic Logic, Inc. (Doc. No. 20 ¶ 2.) Defendant Vitro alleges that he began Aquatic Logic as a sole proprietorship in September 2008 to market water treatment products that are specifically designed for outdoor ponds. (Id. ¶ 5.) Defendant Vitro trademarked the name "Aquatic Logic" on September 10, 2008, and incorporated under the same name on April 27, 2009. (Id. ¶¶ 5,7.) In or around September 2008, Defendant Vitro alleges that he launched the website "www.aquaticlogic.com" to provide information regarding his company and the products it provides. (Id. ¶ 8.) Plaintiff alleges that Defendant Vitro currently operates the website located at www.aquticlogic.com. (Doc. No. 1 ¶ 7.) Defendants allege that they primarily sell their products to distributors in the lawn and garden industry and that they advertise in publications that cater to that industry. (Doc. No. 20 ¶ 15.)

Plaintiff alleges that it became aware of Defendants in December 2008 upon seeing an advertisement in a trade journal titled PondBiz. (Doc. No. 4-2 ¶ 14.) Plaintiff also alleges that it became aware of Defendants' website in December 2008. (Id. ¶ 18.)

///

///

On or about January 5, 2009, Plaintiff sent a letter to Defendants requesting that they cease and desist from all current and future uses of the term "Aquatic Logic" and the domain names "www.aquaticlogic.com," "www.aquaticlogic.net," and "www.auaticlogic.org." (Doc. No. 1 ¶ 33.) Plaintiff sent another letter with the same request on or about March 13, 2009. (Id. ¶ 34) Plaintiff did not receive a response to either letter. (Id. ¶¶ 33-34.)

On or about April 8, 2009, Plaintiff alleges that it was contacted by the National Sales Manager for a trade magazine titled Water Garden News and that the Manager was interested in knowing why payments had not been made on Plaintiff's account. (Id. ¶ 31.) After further research, the Manager informed Plaintiff that there had been a mistake and the Vice President of Plaintiff was led to believe the debt was owed by Defendants and not Plaintiff. (Id.)

Plaintiff also alleges that it received a check from Sea Life Designs, Inc., one of Plaintiff's customers, on or about May 10, 2009. (Id. ¶ 30.) One of Plaintiff's employees contacted the company upon realizing there was no outstanding balance. (Id.) Plaintiff alleges that its employee was informed that the check was sent to Plaintiff in error and should have been sent to Defendants. (Id.)

In early August, 2009, Plaintiff allegedly realized that Defendants had expanded their line from one product to include fifteen additional products. (Doc. No. 4-2 ¶ 18.) Defendants allege that they have not expanded their product line since September 2008, but have merely changed the size of the containers in which their products are sold. (Doc. No. 20 ¶ 18.)

## DISCUSSION

### I.  Preliminary Injunction – Legal Standard

"A plaintiff is entitled to a preliminary injunction in a trademark case when he demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in his favor." Sardi's Restaurant Corp. v. Sardie, 755

1  F.2d 719, 723 (9th Cir. 1985) (emphasis omitted); see Grocery Outlet Inc. v. Albertson's
2  Inc., 497 F.3d 949, 951 (9th Cir. 2007).  The factors "represent two points on a sliding
3  scale in which the required degree of irreparable harm increases as the probability of
4  success decreases." A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir.
5  2001) (quoting Prudential Real Estates Affiliates, Inc. v. PPP Realty, Inc., 204 F.3d 867,
6  874 (9th Cir. 2000)).  Moreover, the two formulations are "not separate tests but 'the outer
7  reaches of a single continuum.'" Grocery Outlet, 497 F.3d at 951 (quoting Los Angeles
8  Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1201 (9th Cir. 1980).

In a trademark case, the likelihood of success on the merits hinges on plaintiff's ability to show that defendant is using a mark confusingly similar to its own.  See GoTo.com. Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000).  So central is the issue of confusion that upon a showing of likelihood of success on the merits, the Court may presume irreparable injury.  Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1066 (9th Cir. 1999).

**II.    Probable Success on the Merits - Likelihood of Confusion**

To determine the likelihood of confusion, courts look to eight factors announced by the Ninth Circuit in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).  The Sleekcraft factors are: (1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of the mark; (5) Defendant's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers.  GoTo.com., 202 F.3d at 1205 (citing Sleekcraft, 599 F.2d at 348-49).

This eight factor test is "pliant"–some factors are "much more important than others, and the relative importance of each individual factor will be case-specific." Brookfield Commc'ns, 174 F.3d at 1054.  "In the context of the Web in particular, the three most important Sleekcraft factors are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel." GoTo.com, 202 F.3d at 1205 (quotation marks and citations omitted).  After assessing these

1 important factors, it is often possible to reach a conclusion regarding confusion without
2 considering every factor. See Brookfield Commc'ns, 174 F.3d at 1054 (citing Dreamworks
3 Prod. Group v. SKG Studio, 142 F.3d 1127, 1130-32 (9th Cir. 1998)).

4     A factory-by-factor analysis leads this Court to believe that, based on the evidence
5 presented by the Parties, the likelihood of confusion between Plaintiff's and Defendants'
6 mark is significant.

**1.     Similarity of the marks**

8     The greater the similarity of the marks at issue, the greater the likelihood for
9 confusion. The Ninth Circuit has "developed certain detailed axioms to guide this
10 comparison: first, the marks must be considered in their entirety and as they appear in the
11 marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning;
12 and third, similarities are weighed more heavily than differences." GoTo.com, 202 F.3d at
13 1206 (citations omitted).

14     With respect to appearance, Plaintiff argues that the color, font, and style of the two
15 marks are very similar. (Doc. No. 4-2 ¶ 20.) Specifically, Plaintiff asserts that both logos
16 are two toned with fish attached to them. (Doc. No. 25 at 3.) Defendants, on the other
17 hand, point to detailed differences between the two logos, focusing on variances in font,
18 color, and layout. (Doc. No. 20 ¶¶ 11-12.) While the two marks are not identical, the
19 Court finds notable similarities. The logos have similar color schemes and fonts, and both
20 feature a fish on the left side of the mark. Weighing similarities more heavily than
21 differences, GoTo.com, 202 F.3d at 1205, the Court finds that the two marks are
22 sufficiently similar in appearance to lead to confusion.

23     In Sleekcraft, the Ninth Circuit stated that "[s]ound is also important because
24 reputation is often conveyed word-of-mouth. We recognize that the two sounds can be
25 distinguished, but the difference is only in a small part of one syllable." 599 F.2d at 351-
26 52. Here, as there, the marks sound very similar and are differentiated by only one syllable.
27 The potential for confusion is therefore significant.
28 ///

1    Because the similarity in appearance and sound between the two marks could lead to
2 confusion, this factor weighs in Plaintiff's favor.

3 **2.    Relatedness of the two companies' services**

4    "Related goods are generally more likely than unrelated goods to confuse the public
5 as to the producers of the goods." Brookfield Commc'ns, 174 F.3d at 1055.

6    Plaintiff argues that both Plaintiff and Defendants provide goods and services to the
7 "aquarium and pond industry." (Doc. No. 4 at 9.) Plaintiff further explains that the pond
8 and aquarium industries are sub-parts of the larger aquatic industry that it serves. (Doc.
9 No. 25 at 4.) Defendants, however, maintain that Aquatic Logic deals exclusively in pond
10 products, and that Plaintiff deals only in aquarium products. (See Doc. No. 18 at 1.) Based
11 on the evidence presented by Plaintiff, this appears to be untrue. Specifically, Plaintiff
12 markets products, such as heaters and chillers, that are used in both ponds and aquariums.
13 (Doc. No. 30 ¶ 6.) Plaintiff also advertises its products in pond industry trade journals such
14 as Koi USA and Water Gardens. (Id ¶ 4.)

15    Beyond overlap in the markets served by Plaintiff and Defendants, the two
16 companies appear to provide similar products. For example, both sell bacteria-based
17 products that are used in aquatic systems. (Id. ¶ 5.) More generally, both Plaintiff and
18 Defendants market products intended to make aquatic environments cleaner and more
19 hospitable to aquatic species. (See Doc. No. 4-2 ¶ 3; Doc. No. 20 ¶ 13.)

20    The similar nature of the goods and services provided by the parties leads the Court
21 to believe that the possibility of confusion is significant. Therefore, this factor also weighs
22 in Plaintiff's favor.

23 **3.    Marketing channel used**

24    "Convergent marketing channels increase the likelihood of confusion." Sleekcraft,
25 599 F.2d at 353. When the Web is used as a marketing channel, the potential for confusion
26 is particularly significant because competing marks can be seen at the same time on the
27 same screen. GoTo.com, 202 F.3d at 1207.

28 ///

1        Both Plaintiff and Defendants market their products through their respective
2 websites where their similar marks are prominently displayed.  Their web addresses are
3 also similar.  As discussed in GoTo.com, use of the internet as a marketing channel
4 exacerbates the potential for confusion.  Id.  Additionally, it appears that Plaintiff and
5 Defendants advertise in the same trade journal called Water Garden News.  (See Doc. No
6 4-2 ¶ 16.)

7        Thought Defendant attempts to distinguish marketing channels by labeling its target
8 audience the "lawn and garden industry," (Doc. No. 20 ¶ 15.), the Court is convinced that
9 the lawn and garden, pond, and aquarium industries are sufficiently related to lead to
10 confusion.  This factor therefore also weighs in Plaintiff's favor.

11 **4.    Strength of the mark**

12       The stronger a mark, the more likely it is to be remembered and associated in the
13 public mind with the mark's owner and the more protection it is accorded by trademark
14 law.  See Brookfield Commc'ns, 174 F.3d at 1058; GoTo.com, 202 F.3d at 1207.  "Marks
15 can be conceptually classified along a spectrum of increasing inherent distinctiveness.
16 From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and
17 arbitrary or fanciful."  GoTo.com, 202 F.3d at 1207 (internal citations omitted).

18       Plaintiff argues that its mark is arbitrary or fanciful.  (Doc. No. 4 at 9.)  However,
19 Plaintiff also asserts that it uses the mark in the "aquatic field."  (Id.)  Since "aqua" is used
20 in both the mark and the description of the relevant field, the Court is inclined to consider
21 the mark suggestive rather than either arbitrary or fanciful.  Moreover, Plaintiff has failed,
22 thus far, to provide evidence that its mark is remembered and associated with Plaintiff in
23 the public's mind.

24       Defendants also suggest that the mark is not strong because there are other
25 companies that use the "Aqua Logic" mark in connection with the sale of pool products and
26 biodegradable lubricants, among other goods and services.  (Doc. No. 18 at 2-3.)  The
27 Ninth Circuit recently stated that "[w]hen similar marks permeate the marketplace, the
28 strength of the mark decreases."  One Industries, LLC v. Jim O'Neal Distrib. Inc., 578 F.3d

1154, 1164 (9th Cir. 2009). The fact that there are other companies using the "Aqua Logic" mark does weigh against Plaintiff. However, it appears that the marks are used in industries unrelated to the industry at issue in this case and that the strength of Plaintiff's mark is not diminished in the market it serves.

While this factor does not weigh strongly in Plaintiff's favor, it does not tip the scale in Defendants' direction.

**5.      Defendants' intent in selecting their mark**

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354. However, a finding of intent to confuse is not required for a finding of trademark infringement. Brookfield Commc'ns, 174 F.3d at 1059; GoTo.com, 202 F.3d at 1208.

It appears that Defendant Vitro lacked actual knowledge of Plaintiff's existence when he created the name Aquatic Logic for his company. Defendant Vitro states that he first became aware of Plaintiff when he received a cease and desist letter on January 5, 2009, and that he began Aquatic Logic and trademarked the name several months before in September 2008. (Doc. No. 20 ¶¶ 5, 9.)

While this factor does not weigh in Plaintiff's favor, proof of intent to copy is not necessary for a finding of a likelihood of confusion. This factor is therefore not decisive.

**6.      Evidence of actual confusion**

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." Sleekcraft, 599 F.2d at 352.

Plaintiff has alleged two instances of actual confusion. First, on or about May 10, 2009, Plaintiff received a check from Sea Life Designs. (Doc. No. 4-2 ¶ 17.) Realizing that the company had no outstanding balance, Plaintiff contacted Sea Life Designs. (Id.) The company informed Plaintiff that the check had been sent to them in error and should have been sent to Defendants. (Id.) Second, on or about April 8, 2009, the National Sales Manager for a trade journal called Water Garden News contacted Plaintiff to ask why

payment had not been made on Plaintiff's account. (Id. ¶ 16.) After further investigation, the Manager informed Plaintiff that he had been mistaken, and Plaintiff was led to believe it was Defendant's debt that the Manager sought. (Id.)

From this evidence, the Court finds that use of the two marks has already led to confusion. Plaintiff's apparent uncertainty about Defendants' role in the April 8, 2009 phone call leads the Court to hesitate before considering it an instance of actual confusion. The incident with the check, on the other hand, clearly shows that the public has been confused by the similarity between the two marks. Since evidence of past confusion is persuasive proof of likely future confusion, the Court finds that this factor weighs heavily in Plaintiff's favor. See Sleekcraft, 599 F.2d at 352.

**7.    Likelihood of expansion into other markets**

"A 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 354 (citing Restatement of Torts § 731(b)). However, "[t]he likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." Brookfield Commc'ns, 174 F.3d at 1060.

As discussed with respect to the relatedness of the two companies' services, the Court finds that Plaintiff and Defendants already compete to a significant extent by providing similar products that are used in the same industry. The likelihood of expansion in Defendants' product lines is therefore relatively unimportant and the Court declines to consider this factor further.

**8.    Degree of care likely to be exercised by purchasers**

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous. When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." Sleekcraft, 599 F.2d at 353 (citations omitted).

///

1    Defendants argue that both companies market their products to high-end,
2 sophisticated consumers with disposable incomes. (Doc. No. 18 at 9.) Moreover, Mr.
3 Fenner, one of Defendants' declarants, compares possible confusion between the two lines
4 of products to someone in the market for a sedan accidentally purchasing a pickup truck.
5 (Doc. No. 21 ¶ 20.) Plaintiff, on the other hand, disputes the idea that their consumers are
6 high-end and sophisticated, and suggests that only minimal care is used when choosing
7 products like bacteria for aquatic systems. (Doc. No. 25 at 7.)
8    Since neither Plaintiff nor Defendants have presented sufficient evidence to support
9 these claims, the Court cannot determine the degree of care exercised by purchasers.
10 Despite its lack of clarity, the Court finds that other factors weigh so strongly in Plaintiff's
11 favor, that a finding for Defendants on this factor would not tip the balance in their favor.
12    From its analysis of the Sleekcraft factors, the Court determines that Plaintiff has
13 demonstrated a likelihood of success on the merits.

14 **III.   Possibility of Irreparable Injury**

15    In a trademark infringement case, irreparable injury may be presumed from a
16 showing of likelihood of success on the merits. See Brookfield Commc'ns, 174 F.3d at
17 1060; GoTo.com, 202 F.3d at 1209. Plaintiff has therefore demonstrated a combination of
18 likelihood of success on the merits and the possibility of irreparable injury necessary to
19 entitle it to a preliminary injunction.

20 **IV.   Parties' Other Requests and Motions**

21    On September 29, 2009, Defendants' filed a request for an evidentiary hearing in
22 connection with Plaintiff's motion for a preliminary injunction. (Doc. No. 22.) Exercising
23 its discretion, the Court denies Defendants' request. On October 6, 2009, Plaintiff filed an
24 objection to evidence presented in Defendants' opposition to Plaintiff's motion for
25 preliminary injunction. (Doc. No. 27.) The Court notes Plaintiff's objections. To the
26 extent they are valid, the court sustains them. To they extent the objections are invalid, the
27 Court overrules them. Plaintiff filed a request for judicial notice on October 6, 2009. (Doc.
28 No. 28.) The Court grants Plaintiff's  requests to the extent the offered documents are

1  properly subject to judicial notice.

## CONCLUSION

Plaintiff has shown a probability of success on the merits and a possibility of irreparable injury if injunctive relief is not granted.  Plaintiff is therefore entitled to a preliminary injunction.

**IT IS SO ORDERED**.

DATED: October 29, 2009

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:

All parties of record